Thaddeus Kantor, Appellee, v. Dziennik Zjednoczenia Publishing Company, also known as Polish Union Daily Publishing Corporation, Appellant.

Gen. No. 39,846.

Opinion filed May 11, 1938.

BEACH & BEACH, of Chicago, for appellant.

CHARLES RALPH JOHNSTON, of Chicago, for appellee;
GREYDON L. WALKER, of Chicago, of counsel.

MR. JUSTICE HALL delivered the opinion of the court.
Defendant, the English name of which is the Polish
Union Daily Publishing Corporation, appeals from a
judgment against it in favor of the plaintiff for the
sum of $15,000, entered in an action in which it is
charged that defendant published in its newspaper of
general circulation among the Polish people of this
community, an alleged libel against the plaintiff, writ-
ten in the Polish language. The alleged libelous mat-
ter as set forth in the complaint, and which, as claimed,
is a translation from Polish into English, is as follows:
"Yesterday into the hands of detectives fell Thad-
deus Kantor, 38 years old, living at 909 N. Hermi-
tage Ave., author of the vaudeville performance
having the title of 'Wedding of John in the Old Coun-
try.' He has been accused of larceny. Kantor sud-
denly became notorious when he put his theatrical
troupe on a herring diet. He is supposed to have done
so, because of lack of funds. Warrants for the arrest
of Kantor were sworn to last Tuesday by Bernice
Maciejewska, of 1639 N. Wood St., and Bernice Ber-
kowicz, living at 2441 S. Whipple St., who were ac-
tresses in Kantor's theatrical troupe. Warrants were
signed by Judge Francis Borrelli. The girls stated
that when Kantor hired them for his troupe, he or-
dered each of them to put up $50 as a security. The
troupe met with great failures in the eastern states
and because of that has returned to Chicago. Kantor
is supposed to have refused to return the security.
But what hurt the girls the most were herrings, with
which Kantor began to feed his troupe. Kantor, as
the girls tell the story, bought a whole barrel of her-

rings which Maciejewska and Berkowicz ate for breakfast, dinner and supper seven days in succession. Yesterday in the detective bureau Kantor gave out such a statement: 'It is true that my troupe has bankrupted and that I was forced to feed the girls with "Schmalz herrings." It is also true that Maciejewska and Berkowicz have been eating the herrings with great appetite. I bought a barrel of herrings on account of Lenten days, because I did not want to break the commands of the church. I could have given my troupe sardines and other fish, but all of them demanded good Jewish schmalz herrings. And if after herrings my whole troupe's appetite was whetted for other foods—that is not my fault.' '' It is alleged and not denied that the above was published by defendant on July 10, 1931. The trial was by jury, which returned a verdict for the amount upon which the judgment was entered.

Defendant insists that the verdict and judgment are contrary to the law and the evidence; that the publication of the article in question was qualifiedly privileged; that the burden of proving that it was false and that defendant was actuated by malice is upon the plaintiff; that the items mentioned in the alleged libelous matter were the truth, and were published with good motives and for a justifiable end, and that none of the words were actionable *per se*. It is also claimed by the defendant that the damages awarded are remote and speculative, and that there was no basis for exemplary damages; that the court erred in giving certain instructions, and that the verdict, even if justified, was grossly excessive.

Plaintiff's testimony is to the effect that since 1928, he had been a Polish radio singer and entertainer in America; that he is a theatrical producer and manager; that he has sung for phonograph records in the years 1927, 1928, 1929 and 1930, and that his earnings

for the time mentioned in this work during these years was approximately $4,000; that he had written a great many plays and translated others from the French, German and English languages into the Polish language, and that he speaks and writes in four languages; that he has been an editor and reporter since 1916; that he had produced various plays in the Polish language in America in various communities where the Polish language was spoken in various parts of the United States, and that he acted and produced these plays during the years 1928 until 1931; that in addition to being a creator and producer of plays, he is also a singer and actor; that prior to 1931, and for a period of four years, his income from articles published in papers was $45 a week; that during the years 1928, 1929, 1930 and part of 1931, his income from plays amounted to $12,000. As to the article in question, the witness states that on July 8, 1931, he was employed on a newspaper in South Chicago, and that on that day he read the article published by defendant; that he called the editor of the defendant's paper on the telephone and told this editor that the article published about him was untrue, and that he, the witness, asked the editor to retract the same, which the editor declined to do, and that the editor informed the witness that he, the editor, now had a chance to get even with him, and that he, the editor, intended to publish so much about plaintiff that he would run the plaintiff out of town. Plaintiff testified that he had known the editor of the defendant corporation, and that he had worked for him in 1923. He also testified to the effect that he took the theatrical troupe on a tour of the eastern States in the spring of 1931, among them being Bernice Berkowicz and Bernice Maciejewska, together with John Grbzybowski, Al Bogucki, one Mr. Rutkowski, Stanley Slawinski and Helen Miechkowski; that he produced a play called,

"John's Wedding in the Old Country," and that the tour started in the month of February and ended in May of the same year. Plaintiff denied that, as charged in the articles published by the defendant of which he complains, the members of the troupe were compelled to live on salt herrings three times a day, or that he ever bought a barrel of herrings for the troupe, and denies that he ever told any member of the troupe that he had no money to buy them food. He testified that he had agreed to pay them $35 a week as soon as the performances started, but that he did not agree to board them; that he told all of his troupe that they would have to have money with them because they would have to be "on their own" for about two weeks, but that shortly after starting on his tour, he ascertained that the members of the company had no money, and that he would have to provide for their board. He further testified to the effect that some time in May or June, 1931, he was associated in the "projected production" of a film play with Octave Orlowski and Mr. Chapulis; that "I had no written contract. It was an oral agreement with them that I was to get $100.00 a day for playing that motion picture and 10% net of the income, and that if the play had been published, it would have been the first Polish talking picture produced in America"; that after the articles were published in the defendant's publication, Orlowski and Chapulis informed the witness that they would not produce the picture, and that they would have to make a scenario for another picture, and that if the witness was playing in this other picture, these persons would not have anything to do with it because of plaintiff's reputation. He testified that things were going badly on his trip with his troupe, that they couldn't make any money, and that it was the opinion of the witness that they should go back to Chicago; that he stated to the members of his troupe that they would have to go back to Chicago,

and that he paid but two of the men members of the troupe the $50 which he had received from them; that there was a discussion at that time between the witness and the members of his troupe concerning the $50 deposit with him as ''bond money''; that when they finished up, they were without money, and that he borrowed money in Cleveland for gas. He also testified to the effect that prior to the publication of the articles complained of that he was able to produce his plays in various churches and parish houses in Chicago and elsewhere, but that in September, 1931, he was told by a priest, having made application for the use of a hall, that he, the priest, would let him know later, but that he never heard from him again; that in September or October, 1931, he had a talk with a Father Strzycki with reference to his play, ''John's Wedding in the Old Country,'' and that this priest told him that he, the witness, had a bad reputation, that the priest had read the article in the Polish Union Daily, and slammed the door on the witness. He also mentioned a number of priests who had declined to allow him to produce his plays after the publication of the article. On cross-examination, plaintiff stated that after he returned to Chicago, the two girls mentioned in the article of which he complains, asked him from time to time for the $50 refund which he had promised to pay them; that on July 8, 1931, he was arrested on a warrant issued on the complaint of these two persons, and that he was locked up in the police station.

Bernice Berkowicz, one of the women who caused the warrant for plaintiff's arrest to be issued, testified for plaintiff and to the effect that during the tour of the troupe in Scranton, Pennsylvania, there was a discussion about wages, that plaintiff told the members of the troupe that business was very poor, that he did not think it would get any better, and that was why they were not getting paid, that he would have

to give them money for food, and that the money which he intended to give them for food was the money he owed them. This witness denied that she made the statement published by defendant as to being compelled to live on herring on the tour. She admitted that she caused the warrant to be issued for plaintiff's arrest. The editor and publisher of the paper was called by plaintiff, and denied all charges made by plaintiff as to any threats made by him against plaintiff, or that he had any feeling of animosity toward plaintiff.

In addition to the article set forth in the complaint filed, and upon which the action is predicated, the following was offered and received in evidence upon the ground that they tend to show malice, and it was admitted by defendant that they represented the matter published in his paper as of July 8, 1931:

"INTERESTING STORY OF A BARREL OF HERRING AND THADDEUS KANTOR.

"The path to dramatic fame may be strewn with roses for Ethel Barrymore, but two young ladies declared yesterday before Judge Francis Borrelli that their paths were sprinkled with salt from herrings.

" 'It was bad enough when we had to do dishes and platters for the whole troupe, and wash costumes without any remuneration, but when it was necessary to live a whole week by eating salted herrings—then the limit of endurance was reached,' declared Bernice Maciejewska, age 22, living at 1639 North Wood Street. 'Always herring, and herring, and herring. Three times a day we ate herrings,' added Bernice Berkowicz, age 21, living at 2441 South Whipple Street.

"FULL BARREL OF HERRINGS.

" 'He bought us a whole barrel of herrings, this our boss, (Thaddeus Kantor, living at 909 North Hermi-

tage Avenue),'.interrupted Miss Maciejewska. 'He said that he has no money to buy us eats, but our contract specified also with board, and so he spent 80 cents for a barrel containing 120 herrings. For breakfast we ate them with bread, for dinner with potatoes, and for supper again with bread. All of us ate herrings, that is nine people of the troupe.'

"Mrs. Maciejewska explained that she, her husband, Al Bogucki, age 26, her friend Bernice and John Brzybowski living at 1313 Julian Street, all joined a travelling troupe as actors in answer to an advertisement by Kantor in one of the Polish dailies. Kantor hired all four, and at the same time took $50 from each person, so that—as he claimed—'to assure himself that they will not leave him in time of need.

" 'What kind of play were you performing on the stage?'

" 'It was "John's Wedding in the Old Country," ' explained Mrs. Maciejewska. 'When I was not playing the mother's role, I performed as a bride. We learned the roles by heart and went East playing performances in Polish halls.'

## "HERRINGS AND HERRINGS.

" 'After a month and a half on the road my husband, who is a painter, decided to return to Chicago and try to find a better job. He, like John, received back his bond money of $50 each and returned to their homes. I decided to still stay with the troupe and earn for myself $30 per week. But, however, Kantor did not put on any more performances and we all returned to Chicago, and Bernice and I never received our $50, nor any pay, nor anything.'

"The Judge acceded to the request of both young women, that Kantor should be arrested and issued a warrant for him."

Plaintiff nowhere claims that he was innocent of the charge made in the warrants issued on the complaint by the two members of his troupe, and upon which the arrest was made. From what we gather from his brief filed, his charge is that the statements in the published article to the effect that his production was a vaudeville performance, that he suddenly became notorious, and that the members of his troupe were compelled to subsist on a herring diet for a number of days, were, of themselves, libelous.

The statute on Libel, ch. 38, pars. 402, 403 and 404, secs. 177, 178 and 179, Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 37.348–37.350], is as follows:

"402. A libel is a malicious defamation, expressed either by printing, or by signs or pictures, or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue or reputation or publish the natural defects of one who is alive, and thereby to expose him to public hatred, contempt, ridicule, or financial injury.

"403. Every person whether writer or publisher, convicted of libel, shall be fined not exceeding $500, or confined in the county jail not exceeding one year.

"404. In all prosecutions for libel, the truth, when published with good motives, and for justifiable ends, shall be a sufficient defense."

As to the publication of the fact that plaintiff was arrested on the warrant for the offense set forth in the complaint, we call attention to the case of *Watson v. Herald-Despatch Co.,* 221 Ill. App. 557, where a newspaper article was published in which the facts of the plaintiff's having been arrested on a warrant was made the basis of a libel suit. In holding that the publication was qualifiedly privileged, the court said:

"The publication was qualifiedly privileged, and it purports to set forth an account of certain judicial proceedings, viz., the finding of the indictment by the

grand jury and the giving of bail by appellant. No opinion is expressed and the article contains no words which *per se* would imply malice, but on the contrary announces appellant's express denial of the accusation.

"Appellant on his cross-examination admitted all the facts, published as such, to be true, with two exceptions. One of these is that the amount of bail on one of the indictments is stated as being $3,000, and the other is that the stock sold was not of an 'automobile' concern but was of some other character of corporation. The gist of the libel, if there be one, would be the false statement that appellant was indicted for the crime mentioned and was compelled to give bail, but appellant admitted these facts to be true. There was no libel in the misstatements of the amount of bail appellant gave and that the stock sold was that of an automobile concern. These misstatements were immaterial and formed no basis for an action for libel. . . .

"The publication being qualifiedly privileged, the burden was on appellant to prove malice, which he failed to do, and the trial court rightly directed the jury to find appellee not guilty."

In 17 R. C. L., par. 91, page 344, and par. 93, page 346, it is said:

"91. It is a general rule that the publication of reports of judicial proceedings is qualifiedly or conditionally privileged. Newspapers, as well as, but no more than, others enjoy this privilege. Though the publication of such proceedings may be to the disadvantage of the particular individual concerned, it is considered that the general advantage to the country resulting from having these proceedings made public more than counterbalances the inconveniences to the private persons whose conduct may be the subject of such proceedings. . . .

"93. It seems to be the concensus of judicial opinion that any proceeding wherein judicial action is invoked and taken is a judicial proceeding a report of which is qualifiedly privileged, though it is had ex parte and without a public hearing. . . ." See also 36 Corpus Juris, page 1276, and *Iddings v. Houser*, 237 Ill. App. 236.

Can it be said that the statement that plaintiff's troupe were compelled to subsist on herrings for a week, is libelous. *per se?* The article published states that this information was received from two women, who filed the complaints upon which the plaintiff was arrested. In the trial of this cause, each of these women denied that they made such statements *in toto*. They did not deny that they had made similar statements to the reporter. Even if it can be said that these statements are libelous, none of the damage which plaintiff is alleged to have sustained, seems to be predicated alone upon these statements. The damage claimed seems to be predicated upon the publication of the true story as to plaintiff's arrest, that he and his troupe became insolvent while on the road, and that he failed not only to pay the members their salaries, but that in addition he was delinquent in failing to return to them the deposit which they gave to him.

On behalf of plaintiff, the court gave the jury the following instructions:

"The Court instructs the jury that the publication of any words which tend to charge a person with committing a. crime, or which tend to injure him in his business or profession, without lawful justification or excuse, is a libel on that person, and in such case the law implies both malice against and damages to such person by reason of such publication.

"The jury are further instructed that in actions for libel the law implies damages for the plaintiff from

the publication of actionable words, and the law also implies that the defendant intended the injury the libel is calculated to effect, and the jury, in case you find a verdict of guilty, are to determine from all the facts and circumstances in the case, what damages ought to be given, and are not confined to mere financial loss or injury.'' These instructions contain language which indicates that the defendant here, as a matter of fact, published words which tended to charge the plaintiff with a crime. It would be a restatement of what we have already said to suggest that the article does no such thing. It merely published the fact that a charge that plaintiff had committed a crime, had been made against plaintiff in the municipal court of Chicago, and that he had been arrested on such charge.

In *Tunnell v. Ferguson,* 17 Ill. App. 76, the trial court gave the following instruction: " 'The court instructs the jury for the plaintiff, that if you find from a preponderance of the evidence in the case that the defendant spoke and published of the plaintiff the words alleged in the plaintiff's declaration, you should find for the plaintiff, and assess his damages at such sum as the evidence may show him entitled to.' '' Because of this instruction, the cause was reversed and remanded, and in so doing, the court said:

''This instruction entirely ignores the plea of justification, and although the jury may have believed the plea of justification, yet they are told if the words were spoken they must find for the plaintiff.''

In *Ambrosius v. O'Farrell,* 119 Ill. App. 265, an action for libel was begun by Tony O'Farrell against certain persons who had addressed the following communication to the mayor and city council of Collinsville, Illinois:

''We, the undersigned voters of Collinsville, do hereby petition the City Council as follows: That where-

as, our Police Magistrate, Tony O'Farrell, has been guilty of the most brazen malfeasance, allowing thugs, criminals and desperadoes of all character to escape without punishment; that whereas, our otherwise peaceful community is becoming a home and shelter for outlaws of the most desperate character, making life and property unsafe and without protection; and whereas, feeling that an emergency exists that our city needs immediate relief from this state of affairs; Be it resolved, that the City Council do hereby instruct the City Attorney, R. Guy Kneedler, to issue all complaints in behalf of the city and arraign all criminal disturbers of the peace, in fact any and all cases in which the City of Collinsville is involved, before such justice of the peace that he may deem of sufficient good standing and ability to enforce the laws and dignity of the City of Collinsville." In commenting upon certain instructions given, the court said: "Whether or not the plaintiff was guilty was not the question. It was sufficient in defense that the defendants had been informed and believed that the plaintiff was guilty of malfeasance in office. It matters not from what source or in what general terms the information was received.

"The second and fifth appellee's given instructions are clearly erroneous and fatally prejudicial to the judgment even if the record were otherwise free from error. In this case they were not applicable as propositions of law and were highly misleading. By them the privileged character of the communication was taken from the consideration of the jury. In effect it was tantamount to an instruction that *prima facie* the petition was a libel and that malice and damages should be implied. The plaintiff's tenth instruction is erroneous, in leaving to the jury the question of whether or not the petition was privileged; but of this appellants may not complain for by their given instruction, 9a, they are committed to the same error."

We are of the opinion that under the facts as they appear in this record, the court was in error in giving to the jury the instructions referred to, and that, therefore, the defendant did not have a fair trial. The judgment is reversed and the cause is remanded.

*Judgment reversed and cause remanded.*

HEBEL, P. J., and DENIS E. SULLIVAN, J., concur.